In re Mary J. Manatt Trust.

C. O. Griffith, Trustee, Appellant, v. R. V. Manatt et al., Appellees. No. 40858.

December 16, 1931.-

Rehearing Denied April 8, 1932.

Edmund D. Morrison, for appellant.

Wilson, Clearman & Brant, A. E. Baldrige, Livingston & Eicher, and T. L. Brookhart, for appellees.

ALBERT, J.— To a fair comprehension of the questions involved herein, a somewhat extended statement of the facts is necessary.

Samuel Manatt and Mary J. Manatt were husband and wife, and were parents of eleven children. They had domestic trouble, and in 1904 a divorce action was instituted by the wife, which was unsuccessful. In 1905, they agreed to divide their property, and to that end warranty deeds of their real estate were made, signed by both husband and wife, with the name of the grantee left in blank, and such deeds were divided between them. The validity of these deeds was passed upon by this court in Manatt v. Griffith, 147 Iowa 707.

On June 3, 1905, Mary J. Manatt utilized the aforesaid deeds which she had received, filling in the name of C. L. Griffith as grantee. At the same time a trust agreement was made between Mrs. Manatt and Griffith covering the land thus deeded to Griffith, which provided, among other things, that she should have the use, possession, and occupancy of all of the real estate, etc., during her lifetime, and at her death the trustee was to take possession, occupancy, and control of the same, paying taxes, compensation, repairs, etc., and gave to the trustee the discretion to divide any surplus rents and profits, in equal proportion, among eight of the children of Mary Manatt, and under certain specific conditions, to nine of the children, and under other conditions, into ten equal shares. Certain powers were conferred upon the trustee and certain duties specified in relation to the trust property until the death of the husband, Samuel Manatt. On the latter event, the trustee was to sell the property, under supervision of the court, and distribute the proceeds to the eleven branches of the heirs of Mary and Samuel Manatt who are named in the trust agreement. The method of determining the amount to be paid to each is specified as follows:

"He shall ascertain as far as possible all of the property received by any of said branches from the father Samuel Manatt either by way of gift or advancement during his lifetime or by will after his death, and he shall treat and consider these matters as advancements to the branches respectively; provided, however, that the advancements charged against said Scott E. Manatt made to this date shall be not less than $1400 and the

advancement charged against Clement V. Manatt made to this date shall be not less than $6,000, and the sums received by the children and heirs of Mary J. Manatt, if any, from the trustee of the rents and profits of the real estate arising after the death of Mary J. Manatt, shall be charged to them and considered in the final distribution. The intention of this distribution is to give to the children and heirs of said Mary J. Manatt such sums from this trust estate as will, so far as possible, make each branch equal in the amount of property received from the estate of both their father and mother, and for the purpose of equalizing the portion received by such of the children or branches as may be discriminated against by their father in the distribution of his estate.''

It then provides for substitution of heirs in case of death of any of the beneficiaries and for the appraisement of any property in kind received from the father, Samuel Manatt, or his estate in any manner, either before or after his death.

Mary J. Manatt died intestate on February 2, 1908.

Samuel Manatt lived in California from 1905 until the time of his death. He was in Iowa in 1917, and made what purported to be a will. This will, with certain promissory notes which he held against certain of his children, and an account book, were left with G. A. Eglin at the Kalona Bank in Washington County, Iowa. In September, 1922, Samuel, then aged 91, was adjudged incompetent, and C. L. Griffith was duly appointed guardian of his person and property, and qualified and acted as such. Samuel died in April, 1924, aged 93 years, in San Diego, California. Upon his death the purported will was filed in the district court of Washington County, Iowa, and admitted to probate on May 6, 1924; and later, on September 19, 1924, the same instrument was admitted to probate in the Superior Court of San Diego, California, as a foreign will, upon a transcript from the Iowa court. Proceedings were had in the California court which resulted in a final accounting there and the closing of the estate in California. Among the other findings of the California court is that from the estate of Samuel Manatt and the estate of Mary J. Manatt there had been advances made as follows: Margaret Griffith, $1,600; Orfa Manatt, $1,300; Florence Worrell, $1,775; C. V. Manatt, $21,000; Tillie Carpenter, $16,406.65; S. E. Man-

att, $5,910.08; Roswell Manatt, $6,321.40; Oden Manatt, $5,-242.49; Guy E. Manatt, $2,724.99; to the children of Wm. Manatt, $3,139.79.

It is further recited that in order to comply with the will of the said deceased and the said trust agreement of Mary J. Manatt, deceased, there should be distributed from said residue and remainder of said estate as follows: (Here follows a list of beneficiaries and the amount to which they would each be entitled out of the remainder of the estate).

I. Stopping now for a moment at this point, it is conceded that certain promissory notes and accounts held by Samuel Manatt against certain of the heirs were taken into consideration in the adjustment of the rights of the respective beneficiaries in the California proceedings, and it seems to be conceded that in so doing the California court charged such heirs with interest on the amounts they had received, as set out in that report. In this pending proceeding in the Iowa court, the question is raised that, while these various amounts which had been received by several of the heirs from the father were properly deductible from the shares of such heirs, interest could not be charged thereon against the respective shares; and with the exception of the share of one heir (which will be referred to later) the question of the interest charge, aside from the question of *res adjudicata* (which will hereinafter be dealt with), is the only question raised. To simplify it, the respective heirs do not question the right to make deductions from each of their shares of the amounts they say are properly chargeable to them, but insist that only the principal of such amounts should be charged against their shares, and they should not be charged with interest on such principal amounts.

The point of divergence lies in the question of whether or not these promissory notes, which were in due form, with a due date, and provided for interest, were advancements made by Samuel Manatt during his lifetime, or whether they were debts due from the respective heirs of the said Samuel Manatt. There seems to be no dispute between counsel as to the law governing this question: that is to say, if they were advancements, they did not draw interest; if they were debts, they did draw interest. At this point in the case the question is whether these various amounts were advancements or debts. To the solution of this

question we have had very little aid from the briefs filed in the case.

What is an advancement?

In McMahill v. McMahill, 69 Iowa 115, l. c. 118, we quoted from Bouvier as follows: "An advancement is 'a gift, by anticipation, from a parent to a child, of the whole or a part of what is supposed such child would inherit on the death of the parent.' "

In In re Estate of Lyon, 70 Iowa 375, we said: "It is nothing more or less than an irrevocable gift made by a parent to a child in anticipation of such child's future share of the estate."

In the case of In the Matter of the Estate of Pickenbrock, 102 Iowa 81, l. c. 85, we quoted with approval from an Alabama case the following: "Advancement is said 'to be a provision made by the parent for his child, of money or property, the entire interest in which passes out of the former in his lifetime; though it is not requisite, in all cases, that it should take effect in possession before the death of the parent.' "

In Bissell v. Bissell, 120 Iowa, 127, l. c. 130, we reiterated the doctrine in the Lyons case and said, with reference to an advancement: "First, then, it must be a voluntary gift, and, second, it must have been made with the intent on the part of the parent that it shall be taken into account on the settlement of the estate. But where a voluntary gift from parent to child is shown, the rule in this state is that it is presumed to be an advancement, and in the absence of evidence to the contrary it will be so treated." It is further said in this case: "But slight evidence is needed to overcome the presumption stated."

The doctrine of prima-facie evidence of advancement has been reiterated in this court many times, and the latest expression thereof is found in Thompson v. Ohl, 187 Iowa, 654.

It is apparent under these authorities that when a parent is shown to have turned over and delivered money to a child, in the absence of all other showing, it is presumed to be an advancement; but it takes slight evidence to overcome this presumption. In the case at bar, the evidence shows that promissory notes, in the usual form, were made by the heirs to the father, specifically having due dates and providing for interest. In the absence of all other testimony, we think the taking of

these promissory notes by the father from the children over-comes the presumption that the amounts which they represented were advancements. This results in a holding that they were debts due the father's estate, and it necessarily follows that they should draw interest. See Bowen v. Evans, 70 Iowa 368.

II. Again, it is insisted that the doctrine of advancement has no application because the father died testate. This seems to be a rule to which the Iowa court is fully committed, as shown by the following cases: In re estate of Lyon, 70 Iowa 375; McCormick v. Hanks, 105 Iowa 639; Spaan v. Anderson, 115 Iowa 121; In re Estate of Cummings, 120 Iowa 421; Gilmore v. Jenkins, 129 Iowa 686; In re Estate Hall, 132 Iowa 664.

That this is the general rule, see note to 32 A. L. R. 730.

III. The question, therefore, at this point is: Did Samuel Manatt die testate?

Bouvier's Law Dictionary defines "testate" as follows: "The condition of one who leaves a valid will at his death." A later edition (Ballentine's Law Dict.) defines it as "a deceased person who died leaving a will; the condition of a person who dies leaving a will."

The purported will reads as follows:

"Whereas, under a certain trusteeship created by my late wife, Mary J. Manatt, under which the disposition of her property among her heirs, under certain condition and otherwise as therein provided, which conditions in a large measure govern the distribution of my estate, I therefore do not make any formal disposition of my property, but do hereby appoint Geo. A. Eglin, of Kalona, Iowa, as executor of my estate, with the request that he comply with the condition as created in the trusteeship of my late wife, Mary J. Manatt, and I further direct that the said Geo. A. Eglin be not required to give bonds as such executor."

It will be noted in this instrument that the last part of the same, after naming the executor, is purely precatory. After reciting his reasons, he says, in terms, that he makes no formal disposition of his property. The question then is, is this a valid will; or, in other words, did Samuel Manatt die testate?

There are some cases which hold that an instrument which recites alone that the decedent wishes his debts paid and names or nominates a certain person as executor is admissible to pro-

bate for the purpose of complying with the wishes of the testator as to the person who shall administer his estate. It is to be noted in the instrument before us that the decedent not only neglected to provide for the disposition of his estate, but specifically says he does not make any disposition of his estate. The fundamental thought underlying a will is that it is an instrument intended to control the disposition of his property after his death, and if it does not dispose of his property or a part thereof, it can not be said to be a will, in so far at least as his property is concerned.

Section 11846, Code, 1924, which is identical with Section 3270, Code of 1897, reads as follows:

"Any person of full age and sound mind may dispose by will of all his property, subject to the rights of homestead and exemption created by law, and the distributive share in his estate given by law to the surviving spouse, except sufficient to pay his debts and expenses of administration."

The very thought underlying a will is a disposition of a part or all of the decedent's property. If it fails to make disposition of his property, or some part thereof, it is not a will. Cases so holding are gathered in notes 79 to 81, 40 Cyc. 1078.

Our conclusion is, therefore, that Samuel Manatt died intestate, which gives rise to an opportunity to apply the doctrine of advancement; but under the fact situation in this case, the charges made against the various heirs are not advancements, but debts due the estate of Samuel Manatt.

IV. Complaint is also made against the ruling of the court as to the claims of C. V. Manatt and Scott E. Manatt, alleging certain miscalculations as to the amounts which should be charged against their respective shares. We have reviewed this matter under the record in the case, and find that the complaints are justifiable. We are satisfied that the calculations made by the California court as to the amounts of principal and interest which should be charged against the shares of the respective heirs were correctly calculated, and we approve the same.

V. Very able and exhaustive briefs have been filed by both parties on the other question raised in the case, to wit: It is claimed that the adjudication of these matters in the California court is *res adjudicata* and binding on this court under Article

IV, Section 1, Constitution of the United States, reading as follows:

"Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."

Having reached the conclusion we do on the merits of this controversy, and our conclusion corresponding with the conclusion reached by the California court, it is unnecessary for us to pass on the question of *res adjudicata* thus raised.—Reversed.

FAVILLE, C. J., and STEVENS, DE GRAFF, and KINDIG, JJ., concur.